IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-199-FL

NANNETTE F. BUCKNER,          )
                              )
          Plaintiff,          )
                              )
          v.                  )                    ORDER
                              )
JACOB J. LEW, Secretary, Department of )
the Treasury,                 )
                              )
          Defendant.          )

This matter is before the court on cross motions for summary judgment. (DE 77, 78).
Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States
Magistrate Judge Kimberly A. Swank entered a memorandum and recommendation ("M&R"),
wherein it is recommended each motion be denied. (DE 105). Issues raised are ripe for ruling. For
the reasons stated below, the court adopts in part and rejects in part the recommendation of the
magistrate judge, grants defendant's motion for summary judgment, and denies plaintiff's motion.

## STATEMENT OF THE CASE

On July 10, 2008, plaintiff, then an employee of the Internal Revenue Service ("IRS"), filed
an administrative complaint of discrimination, hostile work environment and retaliation, asserting
that she was denied a promotion due to her age, gender, and disability, and that she was subjected
to retaliation and a hostile work environment when she began the Equal Employment Opportunity
Commission ("EEOC") process. (Investigative File, DE 1-20 at 19-34). The investigation was
completed in March 2009, and Plaintiff requested a hearing before the EEOC. The hearing was

complete in April 2010, and an Administrative Law Judge ("ALJ") issued a decision on January 5, 2011, determining that plaintiff had failed to establish any of her claims. The agency adopted the ALJ's findings, plaintiff appealed, and the EEOC issued a decision affirming the final order on December 19, 2012.

Plaintiff, proceeding pro se, filed the instant complaint, on March 19, 2013, against the agency and three agency officials in federal court, alleging various violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"), seeking $1.2 million in damages from defendant, in addition to lost back pay and interest. (DE 1-1). The court granted in part and denied in part defendants' motion to dismiss on March 20, 2014, terminating the claims against defendants Mariam G. Harvey, Jacqueline A. Berrien, and Robert L. Hunt. (DE 40).[1] The surviving claims are Plaintiff's ADEA claim and Title VII retaliation claim against the present remaining defendant. After a period of discovery, plaintiff and defendant filed motions for summary judgment on these remaining claims.

In support of their motions, each party relies on a common evidentiary body: emails and documents from the EEOC investigative files (DE 1-20), emails from the pre-hearing file (DE 1-21), testimony from the administrative hearing transcript, (DE 1-22), emails from the administrative file (DE 1-23), and plaintiff's deposition (DE 78-1).

Plaintiff also relies on the following materials in support of her motion: defendant's response to interrogatories (DE 49-3; DE 77-1), affidavit of Florence DuPavelich ("DuPavelich"), a tax attorney who represented a client in one of plaintiff's assigned cases while plaintiff was working at the agency, (DE 71), March 2010 emails (DE 82-2), inventory data from July 2008 (DE 95-2), and

---

[1] The court has constructively amended the caption of the complaint to reflect dismissal of these defendants.

2

internal regulations and manuals on hiring practices not entered into the administrative record. (e.g., Uniform Guidelines on Employee Selection and Placement, Internal Revenue Manual § 6.335.1).

Defendant additionally relies upon the following materials: plaintiff's admissions (DE 78-2), defendant's response to interrogatories (DE 78-3), and the target inventory reports which enumerate the monthly caseloads of employees in plaintiff's workplace (78-4).

## STATEMENT OF THE FACTS

The undisputed facts pertinent to the holding of the court may be summarized as follows. On or about April 2, 2008, plaintiff, classified as a GS-12 Revenue Officer ("GS-12"), applied for a position as a GS-13 Revenue Officer ("GS-13"). Upon initial review of applicants, plaintiff was selected as one of four "best qualified" candidates, as was the selectee, Anita Mastriaco ("Mastriaco"). (Investigative File, DE 1-20 at 195). On April 9, 2008, plaintiff first performed a written case study, and then interviewed for the GS-13 position with a panel of three people. (Id. at 196). Plaintiff states that she was not permitted to bring her personal effects to the case study, which experience left her shaken during the subsequent interview. (Hr'g Tr., DE 1-22 at 630).

On April 10, 2008, plaintiff's supervisor, Jerry Dingus ("Dingus"), described her as the "elderly lady," a comment that was relayed to her by Lisa Ewell Tew ("Tew"), a colleague who later replaced Dingus as plaintiff's supervisor. (Id. at 380, 524-527). On April 15, Janet Fandre ("Fandre"), a member of the interview panel and plaintiff's second-level manager, contacted plaintiff to let her know that they had given the GS-13 position to Mastracio on the basis of superior "communication skills" and greater enthusiasm, but that plaintiff also had a "very good interview." (Id. at 629). Fandre stated that three of the interviewees interviewed well and had answers that displayed technical proficiency, but the deciding factor was at least in part Mastricio's "enthusiasm and energy level." (Investigative File, Fandre Interview, DE 1-20 at 41; Hr'g Tr., DE 1-22 at 108,

3

109). The other interviewers provided corroborating testimony about the interview process. (Hr'g Tr., DE 1-22 at 49-52, 205).

On or about May 2, 2008, plaintiff initiated the EEOC process, and was contacted by the EEOC on May 5, 2008. (Investigative File, DE 1-20 at 81). On May 28th, plaintiff had several contacts with Dingus about work assignments. (Hr'g Tr., DE 1-22 at 638, 639). Dingus initially refused to accept some of her work, raised his voice when she disputed his reasoning, and mentioned he could provide her with training that would lead to another GS-13 position "if she was planning on working much longer." (Id.). Dingus removed or replaced plaintiff on several cases, including a case on which she was approaching resolution. (Hr'g Tr., DE 1-22 at 640, 642).

Plaintiff had several contacts with Robert Hunt ("Hunt"), plaintiff's third level supervisor, when he repeatedly attempted to contact her against her wishes with respect to the EEOC complaint. The only recorded contacts that the EEOC had with Hunt were on June 12 and 13, 2008, when Hunt was interviewed for plaintiff's EEOC complaint. (Investigative File, DE 1-20 at 43). The EEOC contacted plaintiff on June 13, 2008, to notify her of management's offer of a resolution. (Id. at 53).

On June 16, 2008, plaintiff informed her counselor that she was not interested in "management's offer." (Hr'g Tr., DE 1-22 at 643-648). On the same day, a town hall meeting was announced for June 23, 2008. Hunt made four requests to meet with plaintiff after the town hall meeting, once via email through Dingus on June 19, 2008, once via public announcement at a town hall meeting on June 23, 2008, and twice more via Dingus on June 23, 2008. (Id. at 632-638). Plaintiff did not respond to the email or the announcement, but did explicitly express her disinterest in meeting with Hunt in the two face-to-face requests made by Dingus on June 23, 2008. (Id.).

On or about June 25, 2008, after Plaintiff informed Dingus she was entering the Employment Assistance Program ("EAP") counseling, Dingus made a set of comments on how he "would hate

4

to see the quality of her work decline," had "discussed her situation" with another supervisor, and cautioned that she could "win this battle, but lose the war." (Id. at 666, 671). Plaintiff also testified that Dingus later gave her a negative quality review that asserted a violation of taxpayer rights, but withdrew it when challenged. (Id. at 644). Plaintiff filed her EEOC complaint on July 10, 2008, claiming that she was discriminated against, inter alia, when she was not selected for the GS-13 position on the basis of her age. (Pre-Hr'g File, DE 1-21 at 15).

On July 2008 and October 2008, plaintiff was assigned a high caseload. The record shows that on July 2008, she had the highest caseload of any of the GS-12 officers with whom she was working. (Target Inventory Reports, July 7, 2008, DE 95-2 at 9). On October 2008, her caseload was significantly increased such that it exceeded the maximum approved caseload for officers in her position, although she was not the only one with an inventory exceeding the maximum on this month. (Target Inventory Reports, November 22, 2008, DE 78-4 at 10).

On March 5, 2010, Hunt's subordinate initially required her attendance at voluntary town hall meeting involving Hunt on March 28, 2010, though the meeting was later cancelled. (Emails March 2010, DE 1-24 at 30).

## COURT'S DISCUSSION

A.    Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or

5

modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see also United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in (affidavits, attached exhibits, and depositions) must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is

warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

        1.      Age discrimination claim

        Plaintiff's age discrimination claim is governed by § 15 of the ADEA, which provides that "[all] personnel actions affecting employees or applicants for employment who are at least 40 years of age ... in executive agencies ... shall be made free from any discrimination based on age." 19 U.S.C. § 633a(a). There are two tests for age discrimination, but absent direct evidence of age discrimination, courts in the Fourth Circuit apply a modified version of the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006).

        Plaintiff seeks to have the court consider both a mixed motive and pretext framework for discrimination. Under the mixed motive framework, "plaintiff must show that defendant's [adverse employment decision] was at least in part motivated by [age] bias on the part of a relevant decision-maker." Murray v. United Food & Commercial Workers Union, 100 Fed.App'x. 165, 175 (4th Cir. 2004); See Campbell v. Enterprise Holdings, Inc, Case No. 2013 WL 5216735 *5 (E.D.N.C. 2013).

        The pretext framework is a modified McDonnell framework, under which plaintiff initially bears the burden of establishing a prima facie case of age discrimination with respect to a hiring or promotion decision. Id. The elements plaintiff must demonstrate are that: (1) she was at least 40

7

years of age at the time of the discrimination; (2) she applied for the open position or promotion; and (3) the position remained open or was filled by a similarly qualified candidate who was substantially younger than plaintiff. Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 142 (2000).

If a prima facie case is established, then burden shifts to defendant to "articulate a legitimate, nondiscriminatory reason" for the decision. 411 U.S. at 802. The defendant is not required to prove the absence of a discriminatory motive, but only bears the burden of production of this legitimate reason, "as the burden of persuasion remains at all times with the plaintiff." St. Mary's Honor Center v. Hicks, 509 US 502, 507 (1993).

The burden then returns to plaintiff, who must show by a preponderance of the evidence "either directly that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 517. "One way to prove the plaintiff's case would certainly be to show that her qualifications were so plainly superior that the employer could not have preferred another candidate." Dennis v. Columbia Colleton Med. Ctr., Inc., 190 F.3d n.4. (4th Cir. 2002). Another way is to "provide evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning—albeit one based on a real difference in qualifications—manufactured after the fact." Id. Under some circumstances, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves 530 US 134. However, "such a showing by the plaintiff will not always be adequate" to prove discrimination, as plaintiff bears the burden of showing that discrimination occurred, and this is not necessarily proved by showing pretext. Id.

8

Defendant does not dispute that plaintiff has established a prima facie case of age discrimination. Plaintiff was over 40, applied for the GS-13 position, was qualified for the position, and defendant hired an applicant nine years younger than plaintiff. The burden thus shifts to defendant, who asserts that Mastriaco ultimately was selected due to her superior interview, which was "very good" or "outstanding." (Hr'g Tr., DE 1-22 at 49-52, 205, 629). While plaintiff's interview was "excellent," Mastriaco demonstrated superior "communication skills," greater enthusiasm, and a willingness to go above and beyond her normal expected duties. (Id.).

Plaintiff has provided three arguments that plaintiff believes to be evidence that defendant's explanation was false. First, plaintiff argues that she was more qualified than Mastriaco, on the basis that plaintiff had considerably more experience and Mastriaco had a gap in her work history. Second, plaintiff argues that she had a superior interview, as Mastriaco's case study and technical answer to an interview question were merely "very good" as one part was incomplete and another was "shaky," whereas plaintiff answered all questions correctly. Finally, plaintiff argues that that the use of words such as "energy," "high energy," "enthusiasm," "contagious," "ambitious," and "Outstanding!" in the comments by the interview panel about Mastriaco are indicative of age-related considerations, are pretext covering for age discrimination, or, alternately, are impermissible as subjective criteria.

The application process had several phases. (Id. at 55-62). First, the application package of each candidate for promotion was evaluated, with four of the candidates being considered "best qualified." (Investigatory File, DE 1-20 at 194). These four candidates included plaintiff and selectee. (Id.). Selected candidates were then asked to perform a case study and were interviewed. (Id.). It was on the basis of this case study and interview that the selection committee made their

recommendations, and defendant asserts that after candidates had been selected "best qualified" the qualifications of the candidates were not compared at this stage, although the "application package" was weighed when final selections were made. (Hr'g Tr., DE 1-22 at 37-41).

In order to show that a reason is pretextual or "lacks credence," it is most helpful if a plaintiff provides some evidence that directly addresses defendant's explanation or undercuts their motive. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 267-270 (4th Cir. 2005). For example, the Fourth Circuit in Anderson held that plaintiff could not establish pretext via a superior resume and background where the decision was reasonably made on other considerations, such as an interview and a technical evaluation. Id.

By comparison, in Dennis, the plaintiff successfully showed falsity by directly addressing defendant's proffered reason. 290 F.3d 646-647. In that case, plaintiff not only showed that that plaintiff was the only candidate with the qualifications listed as necessary on the application, but that defendant's explanations could not possibly be true, because selectee did not have the special skills asserted by defendant as in its explanation, and moreover, the defendant did not evaluate whether the plaintiff had those skills. Id. This distinction was revisited in Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249 (4th Cir. 2006), where the plaintiff was able to show that the employer's explanation that selectee had superior qualifications was pretextual by showing that not only that plaintiff had the required skills for the job, but that selectee lacked them and had to be trained by plaintiff in order to be qualified, which training occurred after selection. Id. at 151-153. The plaintiff in Heiko was also able to provide evidence that the individuals making the hiring decision made specific references to his disability around the time of the decision. Id. at 262 n.5. Heiko states:

A plaintiff alleging a failure to promote can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons. In conducting this analysis, we are mindful that we assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question.

434 F.3d at 259.

Heiko later clarifies that it is not enough for plaintiff to show that her job qualifications are "slightly superior," but they must make a "strong showing" that they are "demonstrably" or "discernibly" better. Id. at 261. The plaintiff in Heiko showed this by demonstrating not only that he was strongly qualified in the relevant areas, but that the selectee was entirely lacking in certain skills named on the job description, to the extent that Heiko had to train selectee after the promotion. Id. at 260-261.

In this case, by contrast, defendant has provided evidence in the form of testimony and interview notes showing that selectee actually had the technical skills necessary for the position, and plaintiff has not provided evidence showing either a substantial difference in technical skills or reference by the selection committee to plaintiff's age. (Administrative File, DE 1-21 at 29, 41, 42; Pl. M.S.J., DE 77 at 16, n. 62). Defendant has defended the selection of Mastriaco on the grounds of superior enthusiasm and communication skills shown during the interview process. This is supported both by the interview notes and by plaintiff's own admission that she was not particularly enthusiastic during the interview process, as she had been perturbed by being asked to leave her effects behind during the case study. (Hr'g Tr., DE 1-22 at 630; Investigative File, DE 1-20 at 77).

None of the available evidence suggests that defendant's explanation was a false one manufactured after the fact. Plaintiff was given this explanation as early as April 15, 2008, less than a week after the interview and more than two weeks before she elected to file a charge with the

EEOC. (Investigative File, DE 1-20 at 77). This is corroborated by the interview notes, which specifically mention Mastriaco's "enthusiasm" and "professionalism." (Id. at 196). At the same time, plaintiff stated due to an earlier incident, she was shaken during her interview and did not display as much enthusiasm as she usually does. (Hr'g Tr., DE 1-22 at 630). Plaintiff does attempt to argue that defendant's reliance on descriptions such as "enthusiasm" was either itself proof of age discrimination as a code-word, or impermissively subjective to use as criteria. However, the use of a term such as "enthusiasm" does not give rise to an inference of age discrimination. See Papa v. Union Carbide Corp. 971 D.Supp. 220 (W.D. Va. 1997) (referring to somebody as a "bright young scientist" did not give rise to an inference of age discrimination).

Second, while plaintiff may also show falsity by demonstrably better qualifications, plaintiff "cannot establish her own criteria for judging her qualifications for the promotion. She must compete for the promotion based on the qualifications established by her employer." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005). Plaintiff asserts that in selecting Mastriaco on the basis of her greater enthusiasm, energy, and expressed willingness to work with others, despite plaintiff's allegedly superior technical answers, defendant was using the incorrect criteria in making this evaluation. However, the use of criteria to which plaintiff objects does not support an inference of age discrimination, nor does it give rise to an inference that defendant's explanation was pretextual, especially where all of the available evidence suggests that selectee had the criteria described by defendant. (See Pre-Hr'g File, DE 1-21 at 23, 28-29). Instead, it is an attempt by plaintiff to select the proper criteria for the position.

To determine which qualifications were established by the employer, the court refers to several documents, including the official description of the position ("description") found in the

record. (Investigative File, DE 1-20 at 191-194). While the description does refer extensively to technical skills and knowledge, it also refers to communication skills, and calls for applicants to be "motivat[ing]," "influenc[ing]," and "expressive," while stressing that these skills are necessary for several of the leadership-related duties expected in the position. (See Id. at 191, 194). Moreover, the expertise referred to in the description focuses on current "knowledge" rather than "experience" and one of the documents used to evaluate whether a candidate is "best qualified" appears to be a rubric based on technical performance, not on experience. (Performance Evaluation Forms, DE 1-3 at 23-26).

In addition, Fandre testified that as a GS-12 officer, Mastriaco necessarily received the same core training classes as plaintiff, even if they were not explicitly listed on the application. (Hr'g Tr., DE 1-22 at 81). The focus on current performance and skill over experience is corroborated by testimony from the interviewers, who stated that as the remaining candidates had already met the qualification threshold to be granted an interview, and over the course of the interview they were looking at technical skill and performance during the interview rather than experience, and the final decision incorporated both the assessment of experience, the case study, and the interview performance. (Id. at 39-40). Plaintiff points to Fandre's statement that "experience is critical" during the application process to argue that it should have been considered at all stages, but admits that while a certain level of experience was required for the GS-13 position, Mastriaco met the experience requirement. (Pl. MSJ n. 62, DE 77 at 16). Given both were sufficiently qualified, plaintiff's insistence that selectee should not have been selected for interview because of the relative difference in their experience is precisely the sort of attempt to establish her own criteria that Anderson forbids.

13

Plaintiff additionally argues that an alleged deviation from internal procedures can show pretext, and attempts to show such deviations. Instead of becoming involved in the question of whether plaintiff's interpretation of internal agency procedures is both correct and binding, the court simply notes that this position has not been adopted by the Fourth Circuit. See DAG Petroleum Suppliers, L.L.C. v. BP P.L.C., 268 Fed. App'x. 236, 242 (4th Cir. 2008) (holding "evidence that [defendant] erroneously or even purposely misapplied its own policy will not suffice to overcome summary judgment," so long as it was applied to all candidates). Relatedly, plaintiff's allegations that there were mistakes in the failure of the HR official to catch the omissions in Mastriaco's work history are without force, as it "is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [adverse decision.]" Dejarnette v. Corning, Inc. 133 F.3d 293, 299 (4th Cir. 1998) (quotations omitted).

All three members of the interview panel stated that the decision between plaintiff, Mastriaco, and the two other candidates was made on the basis of the interview, and that "enthusiasm tipped the scale" once they were found to be technically excellent. (Hr'g Tr., DE 1-22 at 49-52, 205). The record shows that both plaintiff and Mastriaco were considered to be qualified for the position, and having been selected as such, they were compared through the case study and interview process. (Id.). Plaintiff would prefer that they only consider the technical elements to the answers, and not the manner in which they were communicated, but plaintiff again "cannot choose the criteria by which an employer makes a promotion decision," and has not shown that the experience of applicants was compared during the interview phase, merely that experience was considered at some point in the application process. Anderson 406 F.3d at 270. Plaintiff argues that defendant improperly selected Mastriaco as one of the four "best qualified applicants" even though Mastriaco had a five year gap in her employment history. However, the initial selection for

14

interviews is not an adverse employment decision, and is not the subject of plaintiff's claim. Nor did this initial selection occur to plaintiff's detriment. See Anderson, 404 F.3d at 272. ("The performance evaluation and the interview selection stage, which involves an analysis of how the applicant meets the core and functional competencies of the position that is open, *are not interchangeable*. We do not sit as a super-personnel department weighing the prudence of employment decisions made by the defendants.") (emphasis added).

In terms of the qualifications as measured by defendant's criteria, plaintiff and Mastriaco were similarly qualified. Plaintiff admits that selectee had the experience necessary for the position in question, even if plaintiff was more experienced. (Pl. M.S.J. n. 62, DE 77 at 16). When candidates were ranked in terms of how qualified they were, plaintiff did only marginally better, scoring 53 total points compared to 51 for Mastriaco. (Pre-Hr'g. File, DE 1-21 at 41, 42). Similarly, the interview notes and case study notes have high praise for both plaintiff and Mastriaco. Mastriaco is described as having had a "very good" interview, being "articulate," a "great communicator," "very experienced, "great energy" and "outstanding" during her interview, with a note that she answered part of one question incorrectly. (Id. at 29); (Investigative File, DE 1-20 at 196-197)). Similarly, the interview notes describe plaintiff as having had an "excellent" interview, "speaking from experience," "[showing] a desire to get things right the first time" and someone who "answered all questions thoroughly and correctly." (Id.).

In order to show pretext via superior qualifications, plaintiff must meet the high standard established in Anderson, Dennis, and Heiko. This standard is necessary for the court to ensure that it does not sit as a "super-personnel department weighing the prudence of employment decisions made by the defendants," but instead evaluates the credibility of defendant's explanation. Anderson

15

404 F.3d at 272. Therefore, it is not enough for plaintiff to show that she is "slightly more qualified," Heiko 434 F.3d at 261, but she was more qualified such that defendant "could not have preferred another candidate." Dennis 290 F.3d n.4. Plaintiff has not demonstrated that her interview and case study were substantially superior, that the grounds on which defendant found Mastriaco's interview and case study to be superior were not credible, or any other basis on which a jury might reasonably find that the explanation was pretextual. The court finds that given the standard, plaintiff has failed to show that her qualifications were so demonstrably superior as to give rise to an inference of pretext, and that a jury could not have found that defendant could not have preferred Mastriaco over plaintiff.

For the aforementioned reasons, defendant's motion for summary judgment with respect to the age discrimination claim must be granted and plaintiffs motion must be denied.

2.    Retaliation

Plaintiff's other claim now before the court is that defendant retaliated against her after she commenced a complaint process with the EEOC. Claims of retaliation follow the McDonnell shifting burden framework. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); See also Laber v. Harvey, 438 F.3d 404, 430-432 (4th Cir. 2006). A plaintiff may establish a prima facie case of retaliation under either the ADEA or Title VII by showing that: (1) she engaged in protected activity; (2) a "materially adverse" action was taken against her; and (3) there was a casual connection between the protected activity and the adverse action. Id. Filing a charge with the EEOC is a protected activity. 42 U.S.C. § 2000e-3(a).

A "materially adverse action" is an objective standard that seeks to limit retaliatory actions to only those that would interfere with access to the protected activity. "The anti retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury

16

or harm." Burlington 548 U.S. at 67. It cannot be a "petty slight or minor annoyance that often take place at work and all employees experience." Id. at 68. As an objective standard, it does not rely on the subjective experience of a plaintiff, but inquires whether the action "dissuaded a reasonable worker from making or supporting a charge of discrimination," or would be "likely to dissuade" a "reasonable person in plaintiff's position . . . from complaining or assisting in complaints about discrimination." Id. at 70. As indicated by the words a "person in plaintiff's position," context is important. Actions that would not be materially adverse under one set of circumstances may be adverse under another set of circumstances. See Id.

The court previously rejected defendant's argument that the alleged retaliatory actions must be viewed in isolation. In so doing, the court used the language "the alleged actions considered together may constitute a materially adverse employment action" (DE 1-40) (internal quotations omitted). However, this does not mean that *all* the actions alleged to be retaliatory must necessarily be considered together, but if context suggests that the actions are related, they may be considered together. In Burlington, the Supreme Court considered several work assignments together in determining if they were retaliatory, but considered them separately from a temporary suspension. See Burlington 548 U.S. at 59-74.

A casual connection is one that links the adverse employment action and protected activity. See Laber 438 F.3d at 432. While a causal connection can be established when an employer takes an adverse employment action shortly after learning of a protected activity, "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" is not "sufficient evidence of causality to establish a prima facie case" unless temporal proximity is "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (finding

that three to four months was not proximate enough to establish a causal connection absent other evidence).

Finally, an employer has the burden of producing a legitimate, non-discriminatory explanation, and employee then carries a persuasive burden to show that the explanation given by the employer is pretextual. Laber 438 F.3d at 432.

In this case, plaintiff asserts the following actions support her retaliation claim, premised on beginning the EEOC complaint process on or about May 2, 2008, which complaint was ultimately filed on July 10, 2008.

1.) On May 28, 2008, Dingus initially refused to accept some of her work unless plaintiff took an action she believed to be in violation of the applicable code, and then Dingus raised his voice at plaintiff while walking towards her. (Hr'g Tr., DE 1-22 at 639). He also offered her training for a GS-13 position "if she was staying much longer." Id.

2.) In May, 2008, Dingus removed her from a case shortly before it reached its conclusion. (Id. at 219-221). He also removed her from other cases at unspecified dates. (Id. at 641).

3.) On June 25, 2008, plaintiff told Dingus she wanted EAP counseling, and Dingus expressed concerns about whether the quality of her work would decline. (Id. at DE 1-22 at 643).

4.) At an unspecified date after expressing concerns about the quality of plaintiff's work, Dingus gave her a negative quality review that he retracted once challenged. (Id.).

5.) Plaintiff was contacted by Hunt or his proxies on several occasions from June 19, 2008 to June 24, 2008 to discuss the promotion decision that formed the basis of Plaintiff's EEO complaint. (Id. at 633-636).

6.) One of Hunt's subordinates refused to excuse plaintiff from a normally voluntary Town Hall meeting scheduled for March 28, 2010, at which both Hunt and plaintiff would have been present. (Id. at DE 1-22 at 664). Plaintiff argues that this was retaliation because Hunt was named as a discriminating official in her EEOC complaint, the meeting was announced on February 12, 2010, four days before her hearing on February 16, 2010, and it would take place just before her third and final hearing was scheduled for April 16, 2010.

7.) Plaintiff was assigned a larger caseload than her peers. (Id. at 322, 323); (Target Inventory Reports, DE 95-2).

The first four actions involve Dingus, and arose in close proximity to one another and to the filing of the EEOC claim. Plaintiff told Dingus about the interview for the GS-13 Revenue Officer Position sometime in April 2008, and advised him that she was looking into filing some sort of action. (Hr'g Tr., DE 1-22 at 324).

The first of these is that Dingus refused to accept some of her work unless she took an additional action. Plaintiff testified that when she refused, stating that it was outside her job description, Dingus suggested that she request notes from a taxpayer's attorney, something that she was not allowed to do, and that Tew would be able to verify those comments. (Id. at 639). However, neither Dingus nor Tew remember asking plaintiff to obtain notes from an attorney, (Id. at 159, 306-308), and plaintiff admits that Dingus eventually accepted the work in question. (Id. at 639). Interpreting these facts in the manner most favorable to plaintiff and assuming that these events occurred, this still does not support the claim of an adverse action. A dispute over whether an assignment was complete is not construed as an adverse action, especially when the assignment was accepted soon after.

Dingus then offered Plaintiff training as an alternate track towards a GS-13, but stated that it was conditional on "when she might be leaving." Plaintiff interpreted this as a reference to her age in that she might be approaching retirement, and refused to communicate with him further on the subject. (Id.; Investigative File, DE 1-20 at 83). Plaintiff also refused other GS-13 track training opportunities. (Id. at 131). Plaintiff asserts Dingus's statement is evidence he refused her training on the basis of her age and in connection with the interview, since she had not mentioned her retirement, but the court is not obligated to find plaintiff's interpretation convincing or reasonable.

Plaintiff has not established any explicit connection between the acts and the protected activity. Prior to June 23, 2008, Dingus was only aware that plaintiff had "some sort of action" relating to the GS-13 position, but did not know the specifics of the claim, or the channel through which it was made. (Hr'g Tr., DE 1-22 at 324). While it is possible, though unlikely, that a jury might find a causal connection where less than two months elapsed between the point at which Dingus first learned of the protected activity and the two alleged actions, this is significantly weakened where there has been no demonstration that Dingus was aware of the nature of the action plaintiff had taken, or if it was even protected. Cf. Clark 532 U.S. at 273. (finding that three to four months was too far to establish a causal connection absent other evidence).

Second, plaintiff provided testimony that Dingus removed her from a case shortly before it concluded, and from another case because it was too small. (Hr'g Tr., DE 1-22 at 219-222). Plaintiff connects these actions to the protected activity by noting she was assigned the case on May 2, 2008, before Dingus could have learned of her EEOC claim, but removed her from it later that month. To show adversity, plaintiff has testified that she was confused and upset by this action, and that the government lost money because of the time-sensitive nature of the case. (Id. at 641-642). Plaintiff also argues that this was an adverse action insofar as it could have resulted in a negative

20

quality report, and that she had to contact the attorney again, which may have cost the taxpayer extra money.  Id.

However, speculation on how it might have been adverse is not sufficient, as the government's alleged loss in the case was not marked against her, nor was the possible extra bill to the taxpayer, and plaintiff's testimony that she was upset also fails to establish that it was materially adverse.  Plaintiff cannot bootstrap a speculative concern into materiality by testifying that she was worried about a possible materially adverse outcome absent any evidence such a fear was substantiated.  Simply showing that an outcome is possible is not the same as showing it is likely or reasonable to think that it might occur.  As to the second removal of a case, while a temporary action may be materially adverse, this is heavily dependent on context that shows plaintiff has actually suffered a material harm from a temporary deprivation, and the temporary loss of one of approximately 50 cases does not meet this standard.  See, e.g. Burlington, 548 U.S. at 71-73 (finding that an ultimately restored indefinite suspension without pay could be found to be a materially adverse action where plaintiff suffered hardship from the uncertainty of supporting a family for 37 days without a known source of income).  Plaintiff has not alleged any loss of income or any other adverse outcome that came from having the case removed, merely that it was irregular and against her wishes, which caused her distress.

The third and fourth claims are related, as plaintiff asserts that they are actions questioning the quality of her work that began immediately after she discussed EAP counseling with Dingus.  First, plaintiff testified that when she informed Dingus on or around June 25, 2008 that she was seeking EAP counseling, his demeanor changed, and he said some things she found disturbing, including that he would "hate to see the quality of her work suffer," and "she might win the battle, but lose the war."  (H'rg Tr., DE 1-22 at 643).

21

Plaintiff additionally alleged that sometime after the comments on concern about the quality of her work, Dingus made negative comments on one of her cases during a review. (Id. at 643). Plaintiff challenged him on the negative comments, and he removed them the next day. (Id.). The court finds that these transiently negative reviews could not be materially adverse where plaintiff was given the opportunity to review them, they were promptly corrected when challenged, and resulted in no consequences to plaintiff. None of these actions rise to the level of an adverse employment action, even in the light most favorable to plaintiff.

The fifth and sixth allegedly retaliatory actions arise out of her interactions with Hunt, the regional director for the Agency, and plaintiff's third-level supervisor. The court discusses them separately, noting that all but one of these actions occur within the span of a few days in June 2008, and the last action occurred in February and March, 2010

Hunt was interviewed by the EEOC on June 12 and 13, 2008. (Investigative File, DE 1-20 at 40; Hr'g Tr., DE 1-22 at 558-559). Plaintiff asserts that Hunt then made several contacts in an effort to meet with plaintiff with respect to her EEOC claim, despite plaintiff's consistent refusal to meet with him. (Hr'g Tr., DE 1-22 at 632-638). Plaintiff asserts that the first contact was through the counselor on June 13, 2008, and plaintiff responded on June 13, 2008, that she was not interested in the remedies proposed by management. (Investigative File, DE 1-20 at 53, 81). Although the counselor recorded contacts with the parties, plaintiff has not provided evidence that Hunt was contacted about her refusal, nor is it reflected in the available record. (Id. at 40). On June 19, 2008, plaintiff received an email from Dingus asking her to meet Hunt, as well as an email from her counselor indicating an interest in a similar meeting. (Pre-Hr'g File, Emails, DE 1-21 at 291, 292). Plaintiff responded to the email from her counselor, but not to the email from Dingus. (Id. at 293);

(Hr'g Tr., DE 1-22 at 634). On June 23rd, 2008, Hunt, plaintiff, and a number of plaintiff's coworkers were present when Hunt expressed his intent to meet with plaintiff and two other persons. (Id. at 635). At the end of the meeting, plaintiff left without talking to Hunt. (Id.). Hunt then twice sent Dingus to ask her to meet with him. (Id. at 301). It was not unusual for Hunt to hold Town Hall meetings, or to meet with specific employees at these meetings. (Id.; Investigative File, DE 1-20 at 119).

Plaintiff asserts that these requests for a meeting were retaliatory because she found the requests stressful due to the power disparity, they occurred against her wishes, and she felt that the public announcement was humiliating. Here, plaintiff can meet her burden of showing a connection between the protected activity and the action insofar as Hunt began contacting her in connection to the promotion decision, and did so soon after interviewed for her EEOC investigation. (Investigative File, DE 1-20 at 40).

However, it is not reasonable to infer, from an objective standpoint, that these actions were materially adverse to plaintiff. Plaintiff was one of three people who Hunt announced he was meeting with. (Hr'g. Tr., DE 1-22 at 287). Because plaintiff was not singled out at the meeting by Hunt, but was one of three people who he announced he was meeting with, this could not be found to be a materially adverse action, but something which other people in the workplace regularly experienced. Burlington 548 U.S. at 67. Neither were the two final attempts at contact materially adverse, as no adverse actions came of plaintiff's refusal to meet Hunt, and both used language expressing that compliance was voluntary. (Hr'g Tr., DE 1-22 at 282, 287-293). Plaintiff additionally argues that it was improper and that she was concerned Hunt would attempt to persuade her to either set aside her claim or to engage her in ADR. The counseling report contains a section

23

titled "Counselor's Suggestions to Management Officials to Resolve Complaint." (Investigative File, DE 1-43 at 6). Below it is written "Counselor suggested management have a discussion with the [aggrieved party] AP and explain in detail why the selectee was chosen as opposed to the AP. Counselor also suggested management provide the AP with some suggestions for improving her interview skills." (Id.).

The court finds that speculative concerns on the part of plaintiff on what the meeting might have entailed do not make the action adverse, especially where, even if plaintiff were correct as to Hunt's motives, he was engaging in the precise action that the EEOC urged management to take. An attempt to apologize is not retaliatory, nor is an attempt to resolve a dispute through non-coercive means such as explanations and discourse necessarily retaliatory, even if plaintiff would prefer to receive the remedies she sought via the EEOC. Plaintiff attempts to characterize the request for a meeting as coercive because Hunt could have charged her with insubordination for not following a directive. However, the testimony demonstrates that while plaintiff could have been held insubordinate for refusing a directive, the request to meet with Hunt was held out to be voluntary, nor was a charge of insubordination ever brought up. (Hr'g Tr., DE 1-22 at 282, 287-293). In the absence of evidence that plaintiff was given reason to be concerned about such an action, there is no evidence that a jury could use to reasonably find that this was materially adverse, nor is even a significant difference in power sufficient to make a request automatically coercive.

Plaintiff has asserted that Hunt repeatedly attempted to contact her and she repeatedly declined, and he continued to attempt to contact her. (Id. at 638) ("I've said no, no, no, and he still has pursued me at every turn"). However, this is not reflected by the record. Plaintiff characterizes her June 16, 2008 email as a refusal, but this email was a rejection of the specific offer management

gave her, it was communicated to plaintiff's counselor, not to Hunt, nor is there evidence it was passed on to Hunt. (Investigative File, DE 1-20 at 43). Similarly, plaintiff did not respond to Dingus's email, nor to Hunt's announcement, and while she did explicitly communicate her refusal to meet with Hunt during her first face-to-face meeting with Dingus, which was followed by another request, the last request occurred "within a minute or so, literally" of this refusal. (Id. at 66); (Hr'g Tr., DE 1-22 at 636).

To support the position that contacts may constitute reprisal, plaintiff cites to an EEOC case that held reprisal where employer called employee at employees home on three occasions regarding the EEOC activity. Anderson v. Department of the Air Force, EEOC Appeal No. 01983069 (February 16, 2000). Even if this were binding, this discusses a per se violation of EEOC regulations, not a Title VII retaliation claim. Moreover, an attempt to contact a party at home is highly distinguishable from contacts through workplace channels.

The court has reviewed the sixth action plaintiff claims to be retaliatory, and found it to be without merit after reviewing the record. The sixth claim was that Hunt scheduled a meeting at plaintiff's place of work 'days' before the EEOC hearing was to occur. The EEOC hearings occurred on February 16, 2010, February 17, 2010, and April 14, 2010. (Hr'g Tr., DE 1-22 at 1, 610). The town hall was announced on or about February 12, 2010, but was not scheduled to occur until March 29, 2010, and would have occurred six weeks after the town hall in question, and two weeks before the last hearing, which was not scheduled until after the town hall was announced. (Pre-Hr'g Report, DE 1-24 at 33). Plaintiff asserts that this was an attempt at intimidation.

On February 26, 2010, roughly two weeks after the first hearing, plaintiff's representative asked Hunt whether such a meeting was scheduled, and whether plaintiff would be required to attend. (February, March 2010 emails, DE 82-2). Hunt had decided to reschedule or cancel the

meeting, but had not yet decided to announce, and declined to inform plaintiff's representative, instead suggesting that he go through plaintiff's manager for that inquiry. (Id.). Plaintiff later asked to be excused on March 5, 2010, which request was promptly denied by plaintiff's new supervisor. (March 2010 email, DE 1-24 at 33). Plaintiff's supervisor then contacted Hunt to confirm, at which point it was announced that the meeting was cancelled. (Id.).

As an initial matter, there is no basis to infer that this sequence of events is casually connected to the protected activity, especially when this action is so distinct in time from the other allegations.[2] At the time it was scheduled, it was for more than a month after the only announced hearing, and only connected insofar as it was announced before a hearing. Plaintiff has not alleged that she was named or in any other way singled out by the announcement. Plaintiff has suggested that she would have been stressed by the proximity to Hunt, but scheduling a meeting with a number of people, including plaintiff, and then cancelling it with more than a month's notice is not an adverse action, even if plaintiff might have felt uncomfortable if the meeting were to occur. Plaintiff also asserts that Hunt's failure to inform plaintiff's representative the meeting was cancelled was retaliatory in that he intentionally "forced her into a confrontation that caused her extreme anxiety, fear, and physical illness," when he asked that they make this inquiry through plaintiff's direct supervisor instead. (Pl. Obj., DE 106 at 28). Plaintiff has not provided any support for this allegation beyond his failure to personally inform her attorney that the meeting was cancelled, when said announcement went out seventy two hours later. (2010 emails, DE 82-2; DE 1-24 at 33).

The court has reviewed the record respecting the seventh claim of retaliatory behavior and finds it to be immaterial. Plaintiff notes that she had the largest caseload of any GS-12 officer in the

---

[2]All of the other allegedly retaliatory actions for which a date has been given appear to have occurred in 2008, primarily in the period spanning from May-June. This event occurred in early 2010, roughly 18 months later.

Greensboro officer on July 7, 2008, and a caseload above the acceptable range on November 22, 2008. While workplace assignments can be retaliatory, as defendant notes in their objection to the M&R, neither of these circumstances were unusual for the other GS-12 officers in the Greensboro office. (Id.). Plaintiff had a larger caseload than any of her peers in the Greensboro office on only one of the 18 listed months, and there were rarely more than 30 GS-12 Revenue Officers across the entire Greensboro office. (Target Inventory Reports, DE 78-4). Said caseload was within the accepted range of 34-50 cases, and was only marginally larger than the next largest caseload in her the office.[3] (Id.).

For the month of November 2008, which is the other month on which plaintiff asserts a retaliatory work assignment as her caseload was above the accepted range, plaintiff notes that she had the highest caseload by approximately 16 percent. However, this is only true when compared to the four other GS-12 officers in plaintiff's immediate group, two of whom had reductions for administrative and medical reasons to their caseloads that they also exceeded. (Id. at 10). In the context of the entire Greensboro office, at least three other workers were carrying caseloads outside the accepted range, one of whom carried a heavier caseload than plaintiff by a significant margin. (Target Inventory Reports, DE 78-4). The record further demonstrates that it was not unusual for plaintiff's peers to carry a caseload above the acceptable range, and many of them did so on more than one occasion.[4] (Id.; Hr'g Tr. DE 1-22 at 133) ("We had several inventory outside of just

---

[3] Plaintiff's caseload for July 7, 2008, was 50 cases. The next highest caseload for a GS-12 officer in Greensboro for that report was 49 cases, and the average load appears to have been about 46. While August 2008 is not provided, four of the GS-12 officers in plaintiffthe Greensboro officer on September 27, 2008, had caseloads of 50 or above. (Target Inventory Reports, DE 78-4 at 5-6)

[4] A review of the 18 months for which caseloads have been provided suggests that an average of two GS-12 officers in the Greensboro office had caseloads above the maximum amount on any given month, not taking adjustments into account. (Id.).

[plaintiff]'s that had issues ... if you're a couple of cases over 50, it's not the end of the world."). Even interpreted in the light most friendly to plaintiff, being one of several employees with a heavy caseload on two of 18 months fits squarely within the description of "minor annoyances ... that all workers in the workplace experience." <u>Burlington</u> 548 U.S. 68. Consequently, because this is not materially adverse, the caseload assignment does not meet the prima facie case of a retaliatory action.

In sum, plaintiff has not met her burden of establishing a prima facie case that defendant engaged in materially adverse behavior. Defendant's motion for summary judgment must be granted, and plaintiff's motion for summary judgment must be denied.

## CONCLUSION

Based on the foregoing, the court adopts in part and rejects in part the M&R (DE 105), GRANTS defendant's motion for summary judgment (DE 78), and DENIES plaintiff's motion for summary judgment. (DE 77). The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 30th day of September, 2015.

LOUISE W. FLANAGAN
United States District Judge

28