Motion DENIED

This the 2nd day of November , 20 15 .

/s/ Louise W. Flanagan

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. 5:13-CV-199-FL

| | |
|---|---|
| Nannette F. Buckner, | ) |
| | ) |
| Plaintiff, | ) |
| | ) PLAINTIFF'S MOTION FOR |
| v. | ) THE COURT'S RECONSIDERATION |
| | ) OF ORDER (DE #109) AND |
| Jacob J. Lew, Secretary, Department of the | ) MEMORANDUM IN SUPPORT |
| Treasury | ) |
| | ) |
| Defendant. | ) |

Plaintiff, Nannette F. Buckner, pro se, respectfully moves this court under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend its judgment entered on September 30, 2015 (D.E. # 109).

## BACKGROUND

On September 30, 2015, the Honorable United States District Judge Louise Flanagan entered an Order (D.E. # 109), wherein she granted the Defendant's motion for summary judgment and denied the Plaintiff's motion for summary judgment. As is allowed under Federal Rule of Civil Procedure 59(e) a (3), the Plaintiff submits this Motion for Reconsideration.

## COURT AUTHORITY TO HEAR MOTION

In the Fourth Circuit, a Court can amend an earlier judgment pursuant to Rule 59(e): A(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice. Hutchinson v. Stanton, 994 F.2d 1076, 1081 (4th Cir. 2002). Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir.2006) (quoting Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir.1998)).

This motion is based on the third prong of Rule 59(e)A(3).

**Standard for Relief under Rule 59(e)**

A motion to reconsider under Rule 59(e) should be granted to correct a clear error, whether of law or of fact, and to prevent a manifest injustice. Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (the four grounds for reconsideration are: to prevent manifest injustice, to accommodate for an intervening change in controlling law, to account for newly discovered evidence, or to correct clear error of fact or law); EEOC v. Lockheed Martin Corp., 116 F.3d 110, 112 (4th Cir. 1997). So long as the Rule 59(e) motion is timely filed, the courts have considerable discretion. Lockheed Martin Corp., 116 F.3d at 112. Although the courts are not required to consider new legal arguments, or mere restatements of old facts or arguments, the court can and should correct clear errors in order to "preserve the integrity of the final judgment." Turkmani v. Republic of Bolivia, 273 F. Supp. 2d 45, 50 (D.D.C. 2002). In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see also United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in (affidavits, attached exhibits, and depositions) must be viewed in the light most favorable to the party opposing the motion").

The movant (Defendant) failed to meet their burden of showing that there are no genuine issues of fact: The summary judgments filed by the parties are replete with disputes of facts between the parties.

Further, in clear deference to the Defendant, the Order contains two new factual arguments never before made by the Defendant, both of which are directly refuted by the evidence (as is shown below).

The Order granting summary judgment to the Defendant, as to all of the Plaintiff's claims, is based on conclusions and arguments proffered by the Defendant without due regard to the Plaintiff's counter-arguments, dispute of facts, and the production of evidence to support her position.

Most notably, and prior to the Order, on August 31, 2015, the Plaintiff filed a reply to the Defendant's objections to the M&R, which was done in a timely manner (DE 108). The Defendant chose not to respond.

That pleading contains four specific disputes of fact as to the ADEA claim, and seven factual disputes as to the claims of retaliation.

Most importantly, as to the ADEA claim, the factual disputes between the parties are substantial and detailed, and are critical to the outcome of the case.

The Order adopts the Defendant's argument that both parties performed well in the interview, and answered all of the questions correctly. The Plaintiff has consistently argued that the evidence proves that the selectee did not correctly or completely, answer two of the three technical questions and that the written case study the selectee submitted was viewed as being deficient in fully explaining her answers.

The dispute in this regard is fact intensive: Either the Defendant can produce direct evidence to support their position, or the Plaintiff must do so.

The Plaintiff points to the following evidence to show that the conclusion adopted in the Order, is erroneous and not based on the facts contained in the evidentiary record:

(1) The Order states: "Plaintiff has not demonstrated that her interview and case study were substantially superior, that the grounds on which defendant found Mastriaco's interview

3

and case study to be superior were not credible, or any other basis on which a jury might reasonably find that the explanation was pretextual."

The Plaintiff has clearly and overwhelmingly proved that she had a superior interview, and that that she was more technically competent than the selectee.

The interview process was comprised of two parts: A written examination containing technical issues based on the core requirements for the position, and a face-to-face interview with three technical questions unrelated to the case study presented to each applicant for an oral response.

It is important to note that when comparing the following factual disputes between the parties, that the Plaintiff answered all three questions completely and correctly and the interview panel had no concerns with her analysis of the case study, and accepted it as complete. The facts in dispute are these:

(a) As to the written examination, the notes regarding the selectee state...."Addressed all issues, except – stamp and coin collection, could expand". The selectee analysis of that scenario was incomplete and did not fully describe the appropriate action that should be taken. The notes show that the selectee clearly did not provide a full explanation, while the Plaintiff did. The scenarios contained in the written case study were all based on the core requirements of the position being filled.

(b)The interview notes show that the selectee incorrectly answered the first of three technical questions. The answer was incorrect as the selectee stated that she could serve a levy on the assets of a L.L.C., which if done, would violate the statutes that prohibit such a levy on a non-responsible party. The ability to understand the legal basis for when a levy would be

4

appropriate in such circumstances is one of the core areas of knowledge that a GS-13 must possess in order to perform the job successfully.

(c) The interview notes show that the selectee answered a second question in a manner that the selection official found "shaky". When the selection official was asked what she meant when she used that term, she replied that "I wondered what she meant by that".[1] [2] Further, the selection official testified that she was "uncomfortable" with the response.[3]

The fact that the selection official was unable to understand one of the selectee's responses to a technical question undermines the argument that the selectee was an excellent communicator. The selection official did not ask the selectee to further explain her answer. Given the facts, it is fair to argue that from the selecting official's perspective, the selectee did not answer the question. The fact that the selection official was uncomfortable with the answer undermines any contention that the selectee performed as well as the Plaintiff.

(d) When interviewed by the EEO Investigator on May 5, 2008, or shortly after the selection was made, the selection official stated "… All three females got all of the answers correct and interviewed well."

That statement is plainly contrary to the evidence. This overt misrepresentation of the facts is and would be a considerable factor in proving pretext.

(e) Another interview panel member, Ray, testified that the selectee's response to one of the questions was "questionable". He specifically stated that the questionable item involved the selectee's understanding of when a "transferee" should be pursued. This is one of the core, technical attributes that a GS-13 revenue officer must possess.

---

[1] Please note that when referencing the exhibits attached to the Complaint, the intro pages were numbered by the Court; therefore, the references may be off no more than 1-2 pages.
[2] DE 1, Exhibit 20, Transcript, Page 99, Line 19–Page 100, Line 21.
[3] DE-1, Exhibit 20, Transcript, Page 100, Lines 1-17.

5

(f) Interview panel member Johnson, who initially contended that enthusiasm tipped the scale, changed her position and stated that enthusiasm was not a major factor.[4] She stated that it was the technical ability that was critical.[5] Further, she also stated that the selectee got the answers "100 percent correct". These contradictions show pretext and were intended to conceal the true reason for the selection: Age.

(g) The Plaintiff has shown that one other applicant, near the same age as the Plaintiff, answered two of the three technical questions "perfectly", yet was not selected. It is material that the two oldest applicants performed in a superior manner over the selectee. Also, neither of them was given any benefit of the extensive list of adjectives attributed to the selectee.

(h) Other direct evidence of pretext is taken from the testimony of interview panel member Ray. When he was asked what the subjective criteria, used to support the selection, had to do with the GS-13 position, he admitted "nothing".[6]

(i) The Defendant, while contending that the Plaintiff and the selectee performed equally well in the interview, or did so without any significant difference, then relied on subjective criteria to be the deciding factor. One of the more common and uniform arguments in this regard is the contention that "enthusiasm tipped the scale" in favor of the selectee.

The Order adopts that argument and conclusion.

The evidence shows that interview panel member Johnson testified that the Plaintiff was enthusiastic also.[7] If the Court takes her statement at face value, the fact that the Plaintiff demonstrated the same attribute (enthusiasm), coupled with the fact that she performed decidedly

---

[4] DE-1, Exhibit 20, Transcript, Page 33, Lines 13-24.
[5] DE-1, Exhibit 20, Transcript, Page 34, Lines 17-20.
[6] DE-1, Exhibit 20, Transcript, Page 207, Lines 3-16.
[7] DE-1, Exhibit 20, Transcript, Page 32 Lines 7-13.

better than the selectee on the technical aspects of the interview, leaves the Defendant with no credible basis to defend the selection.

(j) The Court made an argument and reached a conclusion that has never been made or proffered by the Defendant: That the three adjectives contained in the job description show that subjective criteria are already part of the job duties; therefore, the use of subjective criteria is a valid basis for the selection (although the adjectives contained in the position description are entirely different in context than those used in the selection in this case). The Plaintiff has argued and shown proof that the Office of Personnel Management, the Merit Systems Protection Board, the Civil Service Reform Act of 1978, the Internal Revenue Service Guidelines, and certain provisions in section 5 of the United States Code, provide that all selections must be based solely on criteria that is job related, objective, and measurable.[8] The applicable statutes, procedures and regulations consistently stress that only those criteria that are job related are permissible when making a selection. This is a factual dispute that should be resolved by the trier of fact.

(k) The Order did not to give consideration as to the many discrepancies in the application process that have been in dispute between the parties. In doing so, the Court reasoned "whether plaintiff's interpretation of internal agency procedures is both correct and binding, the

---

[8] 5 U.S.C. 2301(b)(1)] provides:
"................All actions - whether identification, qualification, evaluation, or selection of candidates ................shall be based solely upon job related evaluation procedures."

The Office of Personnel Management provides "Structured interviews use job-related questions, treat interviewees consistently, and assess interviewees' responses in a thorough, systematic manner. Structured interviews also focus on the interviewees' answers rather than on their behavior during the interview. Structured interviews are businesslike; they focus strictly on the candidate's qualifications in relation to the job requirements."

The Civil Service Reform Act of 1978 provides "selection and advancement should be determined. To achieve this objective, good intentions are not sufficient. Federal agencies need to ensure that their employment practices, including interviews, are (1) based on job analysis; (2) relevant to the position being filled; and (3) nondiscriminatory...."

7

court simply notes that this position has not been adopted by the Fourth Circuit. See DAG Petroleum Suppliers, L.L.C. v. BP P.L.C., 268 Fed. App'x. 236, 242 (4th Cir. 2008) (holding "evidence that [defendant] erroneously or even purposely misapplied its own policy will not suffice to overcome summary judgment," so long as it was applied to all candidates)."

The Court misapplied the law in this instance as it was only the selectee's application that was allowed to be processed and placed on the BQ although, unlike all of the other applicants, she failed to follow all of the written directives that she must provide all of the information. In fact, the selectee indicated that she was applying for a position that did not exist. The fact that the selection official moved ahead to the selection, without ever resolving that issue, coupled with the significant discrepancies in the selectee's application, shows pretext.

It was only the selectee that was shown deference in being allowed to be placed on the BQ in a manner that was directly against the rules; the agreement with the National Treasury Employees Union (NTEU), or other guidance, including the application forms themselves. The selectee's application was to be suspended for a period of five days in order to provide all of the missing information. Had she failed to do so, she would have been removed from consideration. There are numerous decisions, while not in the Fourth Circuit, that do apply to the facts in this case, and support the Plaintiff's arguments.[9]

The motivation or cause for the selectee's significant and important omissions will never be known; however, it is a reasonable issue to be considered, along with all of the other facts.

---

[9] While a company's "failure to follow internal procedures is generally not enough to create a genuine issue of fact as to discriminatory motives," Grubb v. Southwest Airlines, 296 F. App'x 383, 390 (5th Cir. 2008) (per curiam) (citing Moore v. Eli Lilly & Co., 990 F.2d 812, 819 (5th Cir. 1993)), "the nature of the internal policy and the extent of the deviation in the particular case could give rise to evidence of pretext in light of all the other relevant facts," Martinez v. Tex. Workforce Comm'n–Civil Rights Div., No. A-11-CA-837, 2014 WL 931425, at *7 (W.D. Tex. Mar. 10, 2014) (citing Machinchick v. PB Power, Inc., 398 F.3d 345, 355 (5th Cir. 2005)).

(l) Interview panel member Ray, was asked how he determined that the selectee would go above and beyond the duties of the position, stated "I think it would just be a gut feeling, having managed people and knowing what people can do in a group."[10] This is clearly an unacceptable basis for concluding that an employee did or did not demonstrate that quality.

(m) It is undisputed that when each of three interview panel members, and their superior, Hunt, was asked to identify where the adjectives they used, "energetic", "ambitious", among others, could be found in any official document, regulation or guideline that pertain to the GS-13 position, none could do so. They were asked, assuming that the adjectives were permissible performance indicators, if it was possible to rate, apply or measure them. Again, they stated that they could not. In fact, one panel member, Johnson, stated specifically that she could not rate "enthusiasm".

There was a considerable amount of testimony around this subject. The testimony of the selection official, the interview panel members, and their superior, Hunt, confirmed that the subjective criteria that was used to support the selection were not job-related nor requirements; that a revenue officer that possessed all of the attributes may not be able to perform in an acceptable or satisfactory manner; that what mattered was whether the revenue officer possessed the knowledge and skills to perform the critical elements of the position; and that the United States government does not allow, permit, or tolerate making selections based on factors that cannot be uniformly described, measured and applied fairly.

One panel member was asked to describe how the selectee demonstrated her enthusiasm. She was asked if she did it through certain statements, physical traits, behaviors, etc. The response was that it cannot be described or defined.

---

[10] DE-1, Exhibit 20, Transcript, Page 212, Lines 17-22.

(n) The Order proffered another argument and conclusion that has never been raised by the Defendant: That the Plaintiff was shaken from the initial pre-interview process, and admitted at some point that she was not as enthusiastic as she normally would be; ergo, she did not show enthusiasm during the interview, while the selectee did. The Order referenced this issue twice to stress that it was an important issue that was considered in rendering the decision.

That conclusion, stated as fact, is contrary to the evidence. First, interview panel member Johnson specifically testified that the Plaintiff was "enthusiastic also".[11] Second, the interview panel has never indicated or implied that the Plaintiff was not enthusiastic, energetic, or that she displayed any behavior that would suggest that she was "shaken". In fact, the interview notes state that the Plaintiff "answered all of the questions thoroughly and correctly with confidence",[12] which implies that the Plaintiff was composed and self-assured.

The Plaintiff finds herself in a position of having to argue that the Court itself has made an argument and reached a conclusion that is contrary to the evidence. This issue, in and of itself, creates a factual dispute that is of great significance to the outcome in this case.

(o) There has been a considerable and long standing dispute over the use of the word "elderly" in reference to the Plaintiff.

The Order states: "On April 10, 2008, plaintiff's supervisor, Jerry Dingus ("Dingus"), described her as the "elderly lady," a comment that was relayed to her by Lisa Ewell Tew ("Tew"), a colleague who later replaced Dingus as plaintiff's supervisor. (Id. at 380, 524-527)." The order then moves on to other issues and never offers the context in which the statement was made, which is critical.

---

[11] DE-1, Exhibit 20, Transcript, Page 32, Lines 7-13.
[12] DE-1, Exhibit 18, IF, Tab 19, Page 197, Plaintiff's Summary Recommendation.

The Defendant has asserted that it was only Dingus who used the term "elderly" and did so after the selection was made, and did so without any discussion with the selecting official, Fandre.

The Plaintiff has provided evidence and has argued that Dingus used this term immediately after a face to face meeting with the selecting official; did so prior to the selection being made, and Dingus has acknowledged that Fandre was present when he used the term. The Court has previously noted that the use of the term "elderly" could be an important indicator of age discrimination in this case, if it could be shown that selection official considered or perceived the Plaintiff to be elderly, which could prove pretext.[13] This is a factual and important dispute between the parties.

As the Order noted, only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Here, the dispute over facts is extensive, well documented, and supported by the evidence in favor of the Plaintiff. The Plaintiff has more than met the standard provided for in Dennis v. Columbia Colleton Med. Ctr., Inc., 190 F.3d n.4. (4th Cir. 2002) (One way to prove the Plaintiff's case would certainly be to show that her qualifications were so plainly superior that the employer could not have preferred another candidate). The facts show that her technical expertise, as demonstrated in the interview, was far superior to the performance of the selectee, using any objective standard one chooses.

---

[13] See DE 42, Answer, #9.1.L.

As the Court noted in the Order, "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Here, this standard was not applied fairly or in a balanced manner given the facts, evidence, and the extensive list of factual disputes that were detailed in the Plaintiff's pleadings, and which are contained in the large array of documents she has presented to the court.[14]

The Defendant was shown a significant degree of deference and, as is shown above, virtually all of the Defendant's contentions were adopted by the Court, contrary to the evidence. The Order preempts the right of the Plaintiff to have these facts considered by the Court in a fair and objective manner. It is more than likely that a jury (or the judge in this case), would find that the Plaintiff has proven pretext and did so well in excess of the legal standards that apply.

## **RETALIATION**

The Plaintiff's claims of retaliation were also dismissed without due regard to the facts and arguments that she has made consistently:

**(1)** The Order states: "Plaintiff has not established any explicit connection between the acts and the protected activity. Prior to June 23, 2008, Dingus was only aware that plaintiff had "some sort of action" relating to the GS-13 position, but did not know the specifics of the claim, or the channel through which it was made. (Hr'g Tr., DE 1-22 at 324). While it is possible, though unlikely, that a jury might find a causal connection where less than two months elapsed between the point at which Dingus first learned of the protected activity and the two alleged actions, this is significantly weakened where there has been no demonstration that Dingus was aware of the nature of the action plaintiff had taken, or if it was even protected. "

---

[14] The list of factual disputes as to the Plaintiff's ADEA claim is not all inclusive, nor exhaustive.

The evidence disputes that contention:

(a) The evidence shows that Dingus did acknowledge that he believed that the action was EEO related: "I had heard that there might be an EEO action, that there may be an EEO action.

**(2)** Pertaining to the allegations that Hunt engaged in retaliation when he attempted to meet with the Plaintiff on June 23, 2008, the Order states "Plaintiff responded to the email from her counselor, but not to the email from Dingus. (Id. at 293)…"

(a) The evidence shows that the Plaintiff did respond to Dingus and did so in a face to face discussion. Dingus told her the purpose of Hunt's visit and he has testified "and I imagine she knew what it was about, because she was, you know, she said that she didn't want to go."[15] The two versions of events are in dispute and the Order relied on the version, contrary to the facts, that gave deference to the Defendant's motion.

**(3)** Hunt, who it is alleged engaged in retaliation against the Plaintiff, through repeated attempts to meet with her, has maintained that his only purpose for meeting with her was to offer her an apology. The Order states "…nor is an attempt to resolve a dispute through non-coercive means such as explanations and discourse necessarily retaliatory, even if plaintiff would prefer to receive the remedies she sought via the EEOC."

(a) The Plaintiff points to the evidence that shows that Hunt has stated that his motive for wanting to meet with the Plaintiff was to deliver an apology, which he allegedly had promised the president of the union (NTEU) that he would do. His testimony is contradicted by a sworn affidavit from the president of the employees union, who swears that she never had a conversation with him, and that their only communication was through one email. She further swears that she never asked him to apologize; in fact, she never disclosed the Plaintiff's name in

---

[15] DE-1, Exhibit 20, Transcript, Page 368, Lines 4-6.

order to protect her privacy. This is a critical issue in that if his stated motive for going to the Plaintiff's post-of-duty is called into question by the evidence, it undermines his credibility significantly and would show his intention to retaliate. The Order relied on the Defendant's argument and did so in a manner that enhanced their arguments, without considering the facts that favor the Plaintiff's arguments.

(4) As to the question as to whether Hunt's actions (repeatedly attempting to meet with the Plaintiff once he knew that she had an EEO complaint in process), the Order states " As an objective standard, it does not rely on the subjective experience of a plaintiff, but inquires whether the action "dissuaded a reasonable worker from making or supporting a charge of discrimination," or would be "likely to dissuade" a "reasonable person in plaintiff's position … from complaining or assisting in complaints about discrimination."

(a) In this case, two of the Plaintiff's peers, Griffaton and Torres, aware of her experience from having filed the EEO complaint, sought to be excused from participating in the EEO hearing as witnesses. One witness made a plea to the Agency attorney to be excused due to her fear of retaliation. The other pleaded with the Plaintiff's representative to find a way to excuse her from the proceeding. When both appeared and testified under oath, they specifically stated that they feared retaliation and reprisal for their supporting the Plaintiff, and cited the officials who were likely to retaliate against them as Hunt and Fandre, the two key officials that the Plaintiff alleges retaliated against her.[16]

(b) The Plaintiff's immediate supervisor, Tew, who testified on behalf of management, stated that she would rather not "be involved in this situation".

---

[16] DE 1, Exhibit 20, Transcript, Page 453, Line 25–Page 455, Line 22; Page 466, Line 22–Page 467, Line 19.

(c) One other witness, Hill, testified that he perceived that the actions taken by Mr. Hunt were in retaliation for the Plaintiff having filed an EEO complaint.

This is a significant and critical issue as it shows that Hunt's actions rose to the level needed to prove an adverse action, as defined by the courts. The Order did not consider the testimony of two witnesses who, in fact, were dissuaded from participating in the EEO process and feared retaliation for their having done so.

It must also be noted that in a subsequent act of alleged retaliation, that of Hunt announcing another meeting with the Plaintiff's work group, four days prior to the commencement of the first EEO hearing, the Plaintiff went to great lengths to avoid filing another EEO complaint. She made two informal requests, through her representative, to the Agency attorney. She simply asked if she, Sharon Gipson-Allen, could see if she could be excused from the meeting as she wanted to avoid another dispute with management.

While Hunt maintained that her attendance was voluntary, he nevertheless required that the Plaintiff seek approval to be excused. Her request was denied.

Hunt has never been able to explain why he knowingly placed the Plaintiff in another conflict with management. Only when she could not resolve her concerns in an informal manner did she file another complaint.

There can be no more direct evidence than this to prove the Plaintiff's claim of retaliation against her, and to prove that Hunt's action did, in fact, suppress and discourage others from participating in the process.

(5) The Order states, in regard to Hunt's visit to the Plaintiff's POD on June 23, 2008 "However, it is not reasonable to infer, from an objective standpoint, that these actions were materially adverse to plaintiff. Plaintiff was one of three people who Hunt announced he was

15

meeting with. (Hr'g. Tr., DE 1-22 at 287). Because plaintiff was not singled out at the meeting by Hunt, but was one of three people who he announced he was meeting with, this could not be found to be a materially adverse action, but something which other people in the workplace regularly experienced. Burlington 548 U.S. at 67. Neither were the two final attempts at contact materially adverse, as no adverse actions came of plaintiff's refusal to meet Hunt, and both used language expressing that compliance was voluntary. (Hr'g Tr., DE 1-22 at 282, 287-293)."

That conclusion is contradicted by the facts:

(a) First, the Plaintiff's work group was told that Hunt would only be meeting with GS-9 and GS-11 employees.[17] This statement is supported by numerous employees in the Plaintiff's work group. When Hunt publicly announced that he first would meet with the Plaintiff, who was a GS-12 employee, at least one of her peers wondered why Hunt would name a GS-12 employee, as doing so did not comport with the plans that were announced to the entire group. Another co-worker, Torres, perceived that the Plaintiff was in "trouble" for something.[18]

(b) Second, Hunt stated that he wanted the Plaintiff to remain in the room for a meeting and dismissed all other employees. This was not viewed by the Plaintiff, or several of her peers, as a request, invitation or voluntary.[19]

Contrary to the conclusion contained in the Order, the Plaintiff was clearly singled out.

(6) The Order included an argument that the Defendant has never made or proffered: That the EEO counseling report "urged" Hunt and Fandre to meet with the Plaintiff; therefore, since EEO urged them to pursue the Plaintiff for a meeting, it was an acceptable act. The Order states:

---

[17] Hunt met with two employees briefly and reviewed one case assigned to each of them. The Plaintiff argues that his review was perfunctory and a guise to explain his visit.
[18] DE-1, Exhibit 20, Transcript, Page 468, Line 11 through Page 470, Line 9.
[19] Hunt later testified that he could have cited the Plaintiff for refusing to follow his directive as an act of insubordination.

16

"The counseling report contains a section titled "Counselor's Suggestions to Management Officials to Resolve Complaint." (Investigative File, DE 1-43 at 6). Below it is written "Counselor suggested management have a discussion with the [aggrieved party] AP and explain in detail why the selectee was chosen as opposed to the AP. Counselor also suggested management provide the AP with some suggestions for improving her interview skills." (Id.).

"The court finds that speculative concerns on the part of plaintiff on what the meeting might have entailed do not make the action adverse, especially where, even if plaintiff were correct as to Hunt's motives, he was engaging in the precise action that the EEOC urged management to take."

(a) First, it was not EEO that urged management to meet with the Plaintiff, it was management themselves who proposed a meeting, which she declined.[20] In the email from the EEO investigator to the Plaintiff, wherein she related management's offer to provide her with interview tips, she noted the irony in offering to meet with her as she had interviewed "extremely well".

(b) There is no evidence that the EEO office encouraged Hunt to meet with the Plaintiff when she had declined to do so. That offer, like all pre-filing complaint offers, is extended to the aggrieved party in lieu of filing a formal complaint. It is the aggrieved party that makes the decision to accept or reject management's proposal.

(c) Hunt and Fandre themselves have rejected the notion that they had the right to meet with the plaintiff under the circumstances. During his sworn testimony, Hunt was asked if it be would be appropriate to attempt to meet with the Plaintiff if he knew that she was involved in the EEO process, a question asked of him by both the Plaintiff's representative, and the Agency

_____

[20] Please see evidence, DE 1, Exhibit 19, Prehearing File, Exhibit 19, and Email from EEO Counselor referencing management's offer.

Attorney.[21] Hunt not only responded with an emphatic "no", but went on to state "I don't want to do anything that might give the perception that I'm trying to impede the process".[22]

Fandre took the same position, for the same reasons.

The conclusion and argument contained in the Order is contrary to the position that the Defendant has taken.

(7) The Order states that Hunt, when he first visited the Plaintiff's POD on June 23, 2008, only attempted to meet with the Plaintiff on two, no more than three occasions, and that he had a right to do so. Further, Hunt was free to meet with any or all employees: In essence, there was nothing about the visit on June 23, 2008 that was unusual or that deviated from Hunt's past practice.

(a) That observation is taken out of context and does not weigh the evidence provided by the Plaintiff. The evidence shows that Hunt made four attempts to meet with the Plaintiff, all within a 2 to 2.5 hour period.

(b) The evidence shows that Hunt travelled from Baltimore, MD to the Plaintiff's POD; began to conduct business around 2:15; held the town hall meeting; met with two employees briefly (reviewed one case of each employee); made the four attempts to meet with the Plaintiff, and after her last refusal to meet with him, he returned to Baltimore, MD. His entire visit encompassed no more than two to three hours.

It is highly unusual for the most senior executive in the Southeast Region, who is three levels above the Plaintiff, to drive to her POD, begin business mid-afternoon, and then leave

---

[21] Hunt denies that he knew that the Plaintiff was involved in the EEO process when he made four attempts to meet with her; however, the official report prepared by the EEO investigator shows that she interviewed Hunt on two occasions, June 12 and June 13, 2008, or approximately 9 days prior to his visit. When asked to explain the obvious contradiction, he was unable to do so.
[22] DE-1, Exhibit 20, Transcript, Page 569, Line 17 through Page 570, Line 9; Page 594, Lines 13-22.

immediately after her final declination to meet with her. The driving time alone exceeded the time he spent in her POD.

The context here is critical. If the evidence shows that Hunt's motive for travelling to the Plaintiff's POD was primarily to engage her in a face to face meeting, rather than to conduct official business, as he alleges, it lends significant credence to the allegation that Hunt was determined to engage the Plaintiff in a face to face meeting and took extraordinary (and costly) measures to achieve his purpose, which was retaliatory.

(c) The Order does not appear to have considered the evidence that shows Hunt chose not to use email, a phone call, a letter, a communication through her immediate manager, or any other less-confrontational means to deliver an apology, when he was on notice that she did not want to meet with him face to face. The first time she declined his offer, and certainly by the third time, he knew that he was forcing the issue. When asked, Hunt was unable to explain why he did not choose a far less expensive and confrontation approach in his efforts to meet with the Plaintiff to apologize.[23]

(d) The Plaintiff's manager, Dingus, who informed her that Hunt wanted to see her, testified that the Plaintiff appeared uncomfortable, hurt and distraught. [24]

(e)When Hunt asked him, Dingus, to return to advise her again that he was waiting to see her, Dingus testified that he was uncomfortable doing so, and told Hunt that he had concerns going back a second time. He testified that Hunt was adamant that he do so.[25]

---

[23] Three of the four persons interviewed for the position, except the selectee, were asked to surrender their personal items to a manager prior to being allowed to take the case study. Hunt and Fandre have stated that the manager's actions were inappropriate and were not sanctioned by them. When asked why he, Hunt, had not attempted to apologize to all three applicants, he stated that he chose to apologize to the Plaintiff first as the timing was good as he was in her POD. This is not credible. The other two interviewees have never received an apology from Hunt.
[24] DE-1, Exhibit 20, Transcript, Page 288, Lines 7-14, Page 290, Line 17 – Page -291, Line 23.
[25] DE-1, Exhibit 20, Transcript, Page 293, Line 21 through Page 294, Line 16.

(f) Dingus stated that at this point he was concerned about the Plaintiff, and her reactions, and that he tried to "comfort" her.[26]

(g) The Order does not reference the fact that one of the Plaintiff's peers, Griffaton, was also asked by Hunt to inform the Plaintiff that he was waiting to see her.

The Plaintiff argues that these events, all documented, would persuade a jury that a reasonable person would have viewed Hunt's action as retaliatory.

## Conclusion

First, this motion does not contain all of the factual disputes between the parties, although it does list many of the more significant ones.

In the Fourth Circuit, the Rules of Civil Procedure provide several methods by which judgments may be re-examined. One vehicle is a motion to alter or amend under Rule 59(e). The rule does not specify the reasons that will support such a motion and provides only that such motions "shall be filed no later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e). The case law states, however, that Rule 59(e) motions can be successful in only three situations: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'" Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir.2006) (quoting Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir.1998)).

The Plaintiff is filing this Motion within the ten day period provided. She also is not relying on any new evidence in making this motion.

The Plaintiff wishes to reiterate that it is her hope that nothing contained in the motion is viewed as being intentionally offensive or disrespectful. While she respectfully disagrees with

---

[26] DE-1, Exhibit 20, Transcript, Page 291, Lines 18 - 21

20

the basis for the Order, both as to the law and evidence, she continues to have a high regard for the Court, and for the Honorable United States District Judge Flanagan.

For the foregoing reasons, the Plaintiff respectfully requests that the Court grant the Plaintiff's motion for reconsideration and vacate its prior decision, thereby denying the Defendant's motion for summary judgment and grant Plaintiff any and all relief to which she may be entitled.

Respectfully, submitted on this ___9th___ day of October, 2015.

Nannette F. Buckner
921 Plainfield Church Road
Siler City, NC 27344
rhbuckner@embarqmail.com
919-663-3505
Pro se Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that on the 9th day of October, 2015, the Plaintiff's Motion

for the Court's Reconsideration of Order (DE #109) and Memorandum in Support was served as

indicated on the following:

United States District Court                    Hand delivered to Clerk of Court
Eastern District of North Carolina
Western Division

Michael G. James                                U.S. Mail
Assistant United States Attorney
Civil Division, E.D.N.C.
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601

Date: 10/9/2015

Nannette F. Buckner
921 Plainfield Church Road
Siler City, NC 27344
rhbuckner@embarqmail.com
919-663-3505
Pro se Plaintiff

22